**In re Anonymous No. 89 D.B. 97**

266

Disciplinary Board Docket no. 89 D.B. 97.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

ELLIOTT, *Member,* October 12, 1999—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disci-

plinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On July 15, 1997, the Supreme Court of Pennsylvania issued an order placing respondent, [   ], on temporary suspension from the practice of law until further definitive action by the court. A petition for discipline was filed by Office of Disciplinary Counsel against respondent on September 9, 1997. The petition charged respondent with violations of Rules of Professional Conduct 1.15(a), 1.15(b), 8.4(b) and 8.4(c) based on allegations that respondent misappropriated large sums of money from his partnership and operating accounts over a period of approximately two months. Respondent filed an answer to the petition on October 14, 1997.

A disciplinary hearing was held on April 2, 1998 before Hearing Committee [   ] comprised of Acting Chair [   ], Esquire, and Members [   ], Esquire, and [   ], Esquire. Respondent was represented by [   ], Esquire. Petitioner was represented by [   ], Esquire. At the end of the hearing, the committee was informed that criminal charges pending against respondent had not yet been resolved. The parties presented a joint motion to hold the record open, which was granted by the Hearing Committee on April 30, 1998. Pursuant to that motion, the final disposition of the petition for discipline was deferred until final disposition of the criminal charges.

Respondent entered a guilty plea on May 26, 1998 to theft by unlawful taking or disposition, theft by deception and theft by failure to make required disposition of funds received, and pleaded no contest to theft by unlawful taking or disposition and theft by deception. Respondent was sentenced on June 4, 1998. Chief Disciplinary Counsel subsequently referred these convictions to the Supreme Court which, on September 11, 1998, ordered referral of the convictions to the Disciplinary Board pursuant to Pa.R.D.E. 214(f)(1). The Hearing Committee, in turn, consolidated the matter relating to the criminal convictions with the one commenced by petitioner's original petition for discipline. The parties moved jointly to close the record on September 25, 1998.

The Hearing Committee filed a report on January 27, 1999 and concluded that respondent violated Rules of Professional Conduct 1.15(a), 1.15(b), 8.4(b) and 8.4(c). The committee recommended that respondent receive a two-year period of suspension, retroactive to July 15, 1997, the date of respondent's temporary suspension.

Petitioner filed a brief on exceptions on March 5, 1999. Petitioner requested that the board reject the recommendation of the Hearing Committee and, instead, recommend to the Supreme Court that respondent be disbarred.

Respondent filed a reply to petitioner's brief on March 15, 1999. Respondent contended that the two-year suspension recommended by the committee is a more appropriate sanction than disbarment, based on the facts of the case.

This matter was adjudicated by the Disciplinary Board at the meeting held on May 12, 1999.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born in 1964 and was admitted to practice law in Pennsylvania in 1989. His residence address is [   ]. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) By order of the Supreme Court of Pennsylvania dated July 15, 1997, respondent was placed on temporary suspension, pursuant to Rule 208(f), Pa.R.D.E.

(4) From 1992 until approximately 1997, respondent was the law partner of [A], Esquire, in a partnership known as [B] Law Offices.

(5) The partnership practice concentrated in the representation of medical malpractice plaintiffs.

(6) Respondent managed the business aspects of the practice, including partnership finances, in addition to handling a portion of the partnership's caseload.

(7) As of January 1, 1997, the partnership IOLTA account no. [   ] held at [C] Bank, had a balance of ap-

proximately $15,355.32 in entrustments held on behalf of several clients.

(8) On or about January 6, 1997, the trust account was credited with a $550,000 entrustment received on behalf of a client and, allowing for fees due the partnership, the partnership was charged with a total entrustment of approximately $341,740.

(9) Thereafter, respondent issued six checks drawn on the trust account, bearing the following numbers, made payable to [C] in the following amounts, which amounts were debited on the following dates:

(a) No. 2382 -$41,100—January 17, 1997

(b) No. 2381 -$90,000—January 22, 1997

(c) No. 2380 -$50,000—January 24, 1997

(d) No. 2379 -$70,000—January 27, 1997

(e) No. 2378 -$50,000—January 29, 1997

(f) No. 2377 -$30,000—February 3, 1997

(10) [C], at the direction of respondent, issued five checks, each captioned "official check," made payable to "[D]," in the amounts and on the dates listed above.

(11) [D] was neither a client of the partnership, nor was he owed an outstanding obligation by the partnership.

(12) Although the partnership was charged with a total entrustment of approximately $341,740 as of about February 3, 1997, respondent had reduced the trust account balance to approximately $11,428 due to his unauthorized issuance of checks for purposes unrelated to any partnership entrustment.

(13) On or about March 13 and 14, 1997, the trust account was credited with a $200,000 entrustment re-

ceived on behalf of a client and, allowing for fees due the partnership and net disbursements, the partnership was charged with a total entrustment of approximately $361,740.

(14) As of about March 14, 1997, respondent had reduced the trust account balance to approximately $8,595 due to his unauthorized issuance of checks unrelated to any partnership entrustment.

(15) Respondent issued checks drawn on the trust account bearing the following numbers, made payable to [C] in the following amounts, which were debited on the following dates:

(a) No. 2407 -$20,000—March 14, 1997

(b) No. 2389 -$30,000—March 14, 1997

(c) No. 2406 -$ 7,000—March 20, 1997

(16) On or about March 14, 1997, [C], at the direction of respondent, issued check no. 9448990065 captioned "official check," made payable to respondent in the amount of $20,000.

(17) Respondent was not entitled to receive any portion of the entrustment that funded the official check, which he endorsed and forwarded to [D].

(18) On or about March 14, 1997, [C], at the direction of respondent, issued check no. 944899007, captioned "official check," made payable to "[E]" in the amount of $30,000.

(19) On or about March 20, 1997, [C], at the direction of respondent, issued check no. 944899034, captioned "official check," made payable to "[E]" in the amount of $7,000.

(20) [E] was neither a client of the partnership, nor was it owed an outstanding balance by the partnership.

(21) Although the partnership was charged with a total entrustment of approximately $361,740 as of about March 20, 1997, respondent had further reduced the trust account balance to approximately $1,595 due to his unauthorized issuance of checks for purposes unrelated to any partnership entrustment.

(22) Although the partnership was charged with a total entrustment of approximately $361,740 as of about March 31, 1997, the trust account balance was reduced to approximately a negative $30,429.88 due to respondent's unauthorized issuance of checks for purposes unrelated to any partnership entrustment.

(23) Respondent issued two checks drawn on the partnership's operating account numbered [   ] held at [C], bearing the following numbers, made payable to [C] in the following amounts, which amounts were debited on the following dates:

(a) No. 7935 -$24,000—March 17, 1997

(b) No. 8051 -$15,000—March 19, 1997

(24) [C], at the direction of respondent, issued two checks, made payable to [D], in the same amounts and on the same dates as above.

(25) The unauthorized disbursements respondent made from the trust account and operating account totaled approximately $427,000 until early April 1997, when respondent reimbursed the trust account in the amount of $32,000.

(26) From time to time, either respondent or Attorney [A] would make capital contributions to the partnership's operating account.

(27) On or about April 16 and 17, 1997, respondent deposited into the operating account check no. 2252 and check no. 2253, drawn on his personal account at [C], in the total amount of $30,000.

(28) Respondent's personal account did not contain sufficient funds to enable [C] to honor the checks totaling $30,000.

(29) On or about April 21, 1997, Attorney [A] was informed by [C] that the operating account did not contain sufficient funds to permit [C] to honor checks being written thereon.

(30) On or about April 21, 1997, Attorney [A] confronted respondent about the NSF checks he had drawn against the operating account.

(31) Respondent admitted to Attorney [A] that he had gambling debts, his personal account at [C] was overdrawn, and if the bank did not receive $170,000 immediately, it would report respondent to the FBI.

(32) Attorney [A] contacted [C], which confirmed that respondent was in serious trouble in regard to his personal account.

(33) Attorney [A] requested and received an extension of the deadline [C] had given respondent until April 24, 1997. On April 24, 1997, Attorney [A], believing that the $170,000 was the extent to respondent's financial troubles, made a payment of that amount to [C] on behalf of respondent.

(34) On April 27, 1997, respondent admitted to Attorney [A] that he had, without authorization, issued checks from the trust account in the amount of $388,100 and had reimbursed the trust account in the amount of $32,000 and he would repay the funds in question.

(35) Respondent's unauthorized distribution of funds from the trust account and operating account were accomplished by handwriting checks which should, instead, have been generated by the partnership's computerized bookkeeping system.

(36) Respondent removed from the partnership's records the duplicate copies of the checks he drew on the trust account and operating account representing his unauthorized disbursements of client and partnership funds.

(37) As a result, the partnership's accounting system did not record respondent's misappropriation of funds.

(38) During the meeting between Attorney [A] and respondent that occurred on April 21, 1997, respondent failed to disclose this theft of client funds.

(39) During the April 27 meeting between Attorney [A] and respondent, respondent requested that Attorney [A] not report respondent's misconduct.

(40) The clients of the partnership affected by respondent's theft of funds were:

(a) [F], who was a medical malpractice client of the partnership and had suffered a head trauma;

(b) [G], who was a medical malpractice client and whose infant died while in the care of a hospital; and

(c) [H], who was a personal injury client of the partnership and was injured in an automobile accident.

(41) [F's] spouse executed a full and final release in the amount of $341,932 on April 2, 1998, and [G] executed a full and final release in the amount of $20,639 on April 2, 1998. [H] was due $6,000 from the firm.

(42) [I] Insurance Company agreed to pay the [F] and [G] claims under an errors and omissions policy based on Attorney [A's] purported "negligent entrustment" of money to respondent, his law partner. The payments were made with interest reflecting the delay in payment caused by respondent's activities.

(43) Although the clients of the partnership were made whole approximately one year after respondent's theft of funds, respondent himself has not made full restitution for his misconduct. At the time of the hearing, he had only reimbursed the partnership's trust account in the amount of $32,000 and escrowed only $25,000 with his counsel for the purpose of reimbursing [I] Insurance Company. Respondent has agreed to a confession of judgment against him by [I] for the full amount paid out by them and has agreed to make regular payments.

(44) Respondent began gambling in 1996 and admits to having stopped for approximately one week because he was "sufficiently scared to stop," realized he had to stop gambling, but returned to gambling thereafter, until he no longer had access to funds with which to gamble. (N.T. 139, 140-41, 170.)

(45) Respondent misappropriated funds from the partnership's trust account and operating account to continue gambling because he had exhausted his own funds.

(46) [J] Ph.D., respondent's treating psychologist, diagnosed respondent as suffering from a psychiatric disorder known as pathological gambling when he removed client funds during January, February and March of 1997. (N.T. 198.)

(47) In Dr. [J's] opinion, the episode of pathological gambling was the cause of respondent's removal of client funds from his law firm trust account. (N.T. 201.)

(48) In Dr. [J's] opinion, respondent is done with the episode of pathological gambling, constitutes no danger to the public or legal profession, and is ready to take care of client funds without monitoring from a psychiatrist. Dr. [J] stated, "I would give him my children's college fund." (N.T. 205-206, 225.)

(49) Dr. [J] testified that respondent has gone through a continuing period of remorse with regard to his episode of compulsive or pathological gambling. (N.T. 207.)

(50) [K] M.D., a psychiatrist hired by petitioner, diagnosed respondent as suffering from pathological gambling, accompanied by some reactive depression and marked anxiety, with the reactive depression and anxiety having resulted from his mounting gambling losses and his confrontation with Attorney [A] over his misconduct. (N.T. 254-55, 257.)

(51) Dr. [K] concluded that respondent's gambling became pathological because of how it influenced his behavior and manifested itself in "chasing losses," or continuing to gamble in order to stave off and then recoup his losses. (N.T. 257-58.)

(52) Dr. [K] concluded that respondent's episode of pathological gambling ran from October 1996 through approximately February of 1997. (N.T. 261.)

(53) Dr. [K] concluded that respondent's conduct was episodic because he had no further resources at his disposal with which to gamble, and if he would have been

possessed of unlimited funds, he would have continued gambling. (N.T. 261.)

(54) Dr. [K] concluded that respondent's pathological gambling was a causative factor in his misconduct, and that respondent was chasing after some sort of illusory promise of a return of his money, which led him into taking money from the partnership's trust and operating accounts. (N.T. 265-66.)

(55) Dr. [K] concluded that the recommendation of Dr. [J] that respondent counsel with Dr. [J] for an additional period of five years on a quarterly basis, is the appropriate amount of counseling for respondent. (N.T. 268-69.)

(56) Dr. [K] testified that if respondent attended such counseling sessions, he had a strong opinion that the compulsive gambling would not occur, that respondent was beyond a point where he is susceptible to a recurrence of a pathological gambling episode, and that such conduct was unlikely even if respondent did not attend future counseling sessions. (N.T. 272-73.)

(57) Four character witnesses testified that respondent had an excellent reputation in the community for honesty and abiding by the law.

(58) Respondent entered a plea of guilty on May 26, 1998 to the following felony offenses: Count 1, theft by unlawful taking or disposition; Count 3, theft by deception; and Count 5, theft by failure to make required disposition of funds received. Respondent entered a plea of no contest to Count 2, theft by unlawful taking or disposition; and Count 4, theft by deception.

(59) Respondent was sentenced on June 4, 1998 by Judge [L] of the [ ] County Court of Common Pleas, as follows: Count 1, a period of incarceration of one year less one day, to two years less two days, in the [ ] County Jail with the recommendation for alternative housing and a five-year period of probation; Count 4, one year less one day, to two years less two days, in the [ ] County Jail with the recommendation for alternative housing and a period of five years probation. These sentences were to be served consecutively. A fine was imposed at Count 1 in the amount of $5,000. Counts 2, 3 and 5 merged for sentencing purposes, and the court sentenced respondent to no further penalty.

(60) Respondent was further ordered to pay restitution in the amounts of $368,571 to [I] Insurance Company and $39,000 to the law firm of [B] (the payment of the latter sum subject to the outcome of pending civil proceedings).

(61) By order of court dated July 17, 1998, Judge [L] ordered that respondent comply with court-ordered psychological treatment consisting of his seeing Dr. [J] no less than four times per year for the next five years. Respondent was also permitted to serve his work release time as a law clerk in the office of the public defender of [ ] County.

(62) Respondent has no prior history of discipline.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent's conduct described herein violates the following Rules of Professional Conduct:

(1) R.P.C. 1.15(a)—Failing to hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property;

(2) R.P.C. 1.15(b)—Failing to promptly deliver to a client or third person any funds or other property that a client or a third person is entitled to receive and, failing to promptly render a full accounting regarding such property, upon request by a client or third person;

(3) R.P.C. 8.4(b)—Committing a criminal act that reflects adversely on a lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; and

(4) R.P.C. 8.4(c)—Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

On May 26, 1998, in the Court of Common Pleas of [   ] County, respondent pleaded guilty to three counts of a criminal information which charged him with third-degree felonies for illegally misappropriating more than $350,000 from his law firm's escrow and operating accounts. On June 4, 1998, respondent was fined $5,000, sentenced to a period of incarceration and given five years probation. Significantly, on July 17, 1998, the sentencing judge ordered that respondent obtain psychological treatment no less than four times per year for the next five years.

The following stipulated facts are critical to this board's analysis of respondent's conduct to determine the appropriate discipline to recommend:

"For five years, respondent was a law partner in a two-person firm which concentrated its practice in medical malpractice;

"In addition to his caseload, respondent was entrusted by the founding and sustaining member of the firm with the firm's business management, including the firm's finances;

"Between January and March 1997 respondent misappropriated more than $350,000 from the firm's escrow and operating accounts;

"To avoid detection of his misappropriations, respondent hand wrote checks and by-passed the firm's computerized bookkeeping system which he had the duty to maintain;

"To avoid detection of his misappropriations, respondent removed from the firm's records the duplicate copies of checks he drew on the escrow and operating accounts;

"Respondent lied when initially confronted by his partner about why checks drawn on the firm's operating account were dishonored; days later, respondent admitted his misappropriations to his partner."

Respondent offered expert medical testimony to explain why an attorney who had no record of prior discipline would commit these felonies and serious violations of the Rules of Professional Conduct. Respondent's treating psychologist testified that respondent's compulsive gambling disorder caused his illegal misconduct. A gambler since 1996, respondent had substantial gambling losses, and when he exhausted his personal funds to satisfy his compulsive gambling, he turned to the firm's operating and escrow funds.

The Office of Disciplinary Counsel also offered expert medical testimony from a board certified psychiatrist which corroborated the principal conclusions of respondent's psychologist. The critical points of expert agreement are:

"Respondent suffered from a pathological gambling disorder during the time period of his misconduct;

"That pathological gambling disorder caused the dissipation of significant personal funds and his substantial misappropriations of his law firm's funds;

"Respondent recognizes he needs help in the form of continuing psychological treatment;

"With the benefit of the continuing psychological treatment, it is unlikely that respondent would engage in the misconduct again;

"Respondent poses no danger to himself or the public."

The clear and convincing expert testimony in this case therefore satisfied the *Braun* standard, and *may be* used to mitigate respondent's discipline. *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989).

This board looks at the totality of the circumstances to determine the appropriate discipline for each case, and while the board looks to similar cases for guidance, there is no per se standard. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983).

As in most cases of extreme misconduct, the choice of discipline ranges from a lengthy suspension to disbarment, but there is no per se disbarment for substantial misappropriations. *Office of Disciplinary Counsel v. Chung,* 548 Pa. 108, 695 A.2d 405 (1997). In the instant

case, the Office of Disciplinary Counsel seeks disbarment and respondent's counsel seeks a suspension of no more than one year, and the Hearing Committee recommended a two-year suspension. All three of these perspectives are undoubtedly supported by the good faith arguments of their respective proponents, but in this board's view, none of them is correct. Respondent's conduct is so egregious that the expert testimony and other mitigating factors cannot reduce the discipline below a five-year suspension.

This respondent was genuinely remorseful, offered favorable character testimony, cooperated with prosecutors and the Office of Disciplinary Counsel, had no prior disciplinary proceedings and is making restitution.[1] It is also very significant that respondent continues the court-ordered psychological treatment. If respondent failed to prove these additional critical mitigating factors, this board could very well have recommended disbarment.

In *In re Anonymous No. 50 D.B. 92*, 32 D.&C.4th 6 (1995), this board recommended a five-year suspension for an attorney who misappropriated substantial sums from an estate he administered. That respondent offered

---

1. The malpractice carrier for respondent's former firm paid to the firm all of the funds misappropriated by respondent, and respondent agreed to an entry of judgment by the carrier for the full amount paid out by them. To date, he has made and/or escrowed payments of $57,000. This unusual arrangement is not without its consequences, however, as his former employer testified that as a result of respondent's conduct, his malpractice premium is now five times higher. The relationship of respondent and his former employer is the subject of pending litigation which has no impact on these disciplinary proceedings.

expert testimony to establish the causal link between his conduct and his compulsive gambling disorder and alcoholism. The only case where this board recommended disbarment when the *Braun* standard was met was in *Matter of Renfroe,* 548 Pa. 101, 695 A.2d 401 (1997). The crucial distinction in that case was respondent's conviction of bribing a witness which the Supreme Court concluded struck at the heart of our judicial system and required disbarment despite the expert testimony satisfying the *Braun* standard.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [   ], be suspended from the practice of law in the Commonwealth of Pennsylvania for a period of five years, retroactive to July 15, 1997. Since respondent's continued psychological treatment was ordered by the court, there is no need to add that as a condition to this suspension.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Chair Caroselli and Member Iole recused themselves.

## ORDER

And now, December 9, 1999, upon consideration of the report and recommendations of the Disciplinary Board dated October 12, 1999, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of five years, retroactive to

284

July 15, 1997, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.